Affirmed and Memorandum Opinion filed May 28, 2009








Affirmed and Memorandum Opinion filed May 28, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00702-CR

____________

 

KRYSTAL MICHELE JAHANIAN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 183rd
District Court

Harris County, Texas

Trial Court Cause No. 1059703

 



 

M E M O R A N D U M   O P I N I O N

A jury found appellant Krystal Michele Jahanian guilty of
engaging in organized criminal activity with family members and others to
commit and conspire to commit the first-degree felony offense of theft of
property valued at over $200,000.  The jury assessed her punishment at
confinement in the Texas Department of Corrections, Institutional Division, for
twenty-five years, and the trial court sentenced her accordingly.  On appeal,
Krystal contends the evidence is legally and factually insufficient to support
her conviction.  We affirm.








Factual and Procedural Background

Krystal does not dispute the evidence that she participated
in organized criminal activity.  From January 2004 through February 2006,
Krystal and other members of the Jahanian family, including her parents, Bahram
AB.J.@ Jahanian and
Cindy Jahanian, and her brother, Nicholas Jahanian, participated in a theft
scheme to unlawfully obtain merchandise from stores throughout Texas and to
sell the merchandise for profit though Nicholas Jahanian=s eBay account
named ABwatchers.@[1]  Others also
participated in the scheme, including three accomplices who testified during
the trial, Valerie Baker, Elizabeth Espirit, and Richard Schroeder.  The stores
targeted in the scheme included Target, Wal-Mart, Home Depot, and Lowe=s. 
Representatives of these stores were named as the owners of the property in the
indictment against Krystal. 

Krystal=s father, B.J., was confined in a Texas
prison during the time the theft scheme operated.  Despite his confinement, he
instructed the others as to how to carry out the scheme during prison visits
with Nicholas or by mail sent from prison to Cindy at her residence, which she
shared with Krystal, located at 19615 Spanish Needle in Harris County.  B.J.=s advice included
telling them to stay away from Target stores, to go out of town more, and to
use more than two drivers.  He also did not want Nicholas involved in going to
the stores.








The scheme operated as follows.  Cindy, Krystal, and an
accomplice, usually Elizabeth Espirit but sometimes Richard Schroeder, would
drive to one of the stores somewhere in Texas, and Cindy and Krystal would
enter the store with labels showing UPC codes for low-end or low-priced
merchandise that they or someone else in the theft ring had purchased or stolen
for the purpose of getting the bar codes.[2] 
Once inside the store, Cindy and Krystal located usually at least two high-end
items such as MP3 players, faucets, cameras, phones, DVD recorders, or
printers.[3] 
While one acted as lookout, the other placed the bar-code labels for the
lower-priced merchandise over the bar code shown on the high-end items so that
the desired merchandise could be purchased for a substantially lower price.  

Once the bar codes were switched, Cindy or Krystal placed a
cell-phone call to the accomplice, who separately entered the store, and gave
the accomplice a description of the desired merchandise and its location. 
Cindy and Krystal then left the store, and the accomplice, who was also
permitted to purchase a very low-priced item for personal use at the ring=s expense, would
locate the merchandise and attempt to check out with it.  When possible, the
accomplice would take the merchandise to a check-out counter occupied by a
young, seemingly inexperienced clerk.  When the merchandise rang up at the
lower price shown by the switched bar code, the accomplice paid for it and the
personal item, left the store, and returned to the car.  The three would then
either go to another store or quit for the day.  Cindy and Krystal would then
store the stolen merchandise either at their home or a storage unit they
maintained.

To dispose of the merchandise, Nicholas Jahanian sold the
items on eBay using his eBay account, known as ABwatchers,@ and sent the
merchandise to whomever had purchased it.[4] 
Nicholas then distributed the profits among himself and the other members of
the ring, including Cindy and Krystal.  The eBay business prospered and
supported Nicholas, Cindy, and Krystal.








Doug Osterberg, an investigator in the Harris County
District Attorney=s Office Special Crimes Division,
testified extensively about his involvement in the investigation of the theft
ring and its operation.  He also provided testimony about the value of the
stolen property.  Among other things, Osterberg testified that records obtained
from eBay showed that the types of items being sold through the Bwatchers
account were MP3 players, faucets, electric razors, cordless phones, print
servers, and cameras, most of which were listed as Anew in box.@  For the period
that eBay records were available, October 2004 to the end of October 2005,
Bwatchers sold 2,109 items for a total of about $258,000.  At this point,
Osterberg decided to contact the loss-prevention departments of several of the
stores for assistance.  Store personnel and additional officers conducted
surveillance on the ring, and the jury was shown security-camera videos of the
ring=s operation.   

On cross-examination, Osterberg explained that he went over
the records of the Bwatchers account with loss-prevention personnel, and
although they were able to show that there were losses in the areas of those
types of products, they could not say that specific items on the list actually
came from their stores.  Osterberg agreed that the only items actually traced
back to specific stores were those that the ring was observed stealing during
surveillance.  He also agreed that the eBay list did not show how much the
Jahanians might have paid to acquire the items originally; it showed only the
price that eBay customers paid Bwatchers for the items.[5] 
He also admitted that some of the merchandise came from other stores not
included in the case.  








Osterberg further testified that his office calculated the
amount of the stores= losses primarily by using the eBay
records.  When asked if he knew what the ring actually paid for the items, he
explained that the sales price was usually either about $27 or $7, depending on
which of two fake bar codes they decided to use.  The bar codes were copied
from Lexmark ink printer cartridges and water filters the ring purchased. 
Osterberg stated that his testimony was based on information from other
participants in the ring and evidence seized from Cindy=s and Nicholas=s homes and a
storage unit Cindy controlled.  

Larry Boucher, another investigator with the Harris County
District Attorney=s Office, and Osterberg=s direct
supervisor, also testified concerning his participation in the surveillance of
Cindy Jahanian, Krystal Jahanian, and Elizabeth Espirit on January 26, 2006. 
The surveillance captured both successful and unsuccessful attempts to carry
out the theft ring=s operation.  On that day, Boucher
observed the group first going to a Target in Harris County, where their
activities were captured on video.  Boucher testified that the video showed
Cindy and Krystal enter the Target, examine a Kodak printer bundle, consisting
of a camera and printer dock, priced at $249.99, and put two of them in a
cart.  Elizabeth Espirit entered after Cindy and Krystal, but ultimately they
abandoned the effort and went to another Target store.[6]

After leaving the second Target store, the trio then went
to a Wal-Mart in Brenham, where they were again captured on video.  The video
showed Cindy and Krystal going down an aisle where phones were sold, but they
left without buying anything.  Elizabeth Espirit separately entered the store,
went to the same aisle, and picked up two boxes of Panasonic cell phones along
with some children=s socks.  She then went to a self-checkout
aisle and attempted to scan the items, but when a cashier came over to assist
her, the cashier saw that the phones were ringing up as $27.97.  The cashier
peeled off the UPC codes, and the phones rang up as $154.96.  Espirit made an
excuse and left the store without purchasing anything. 








Boucher testified that the surveillance continued as the
trio next went to a nearby Lowe=s store.  There, after Cindy and Krystal
went to an aisle containing water filters, Espirit later went to the same
aisle, picked up four Brita water filters, and purchased them for $6.96 apiece,
when their actual price was around $32 apiece.  The trio then continued on to a
Home Depot in Brenham.  As before, they were captured on video, and Boucher
described their activities.  At the Home Depot, Cindy and Krystal went down an
aisle where faucets were located, and Espirit entered the store separately and
went to the same aisle, picked up two faucets, and checked out.  The faucets
rang up as water filters for $26.97 apiece.  Boucher testified that the faucets
were actually priced at $208.  On cross-examination, Boucher admitted that the
total amount of loss from the stores where merchandise was purchased, after
subtracting what was paid, came to roughly $600.  He also admitted that he did
not see Cindy or Krystal switching the UPC codes, nor did he see them walk out
of the stores with any merchandise.  He also never came in contact with
Nicholas Jahanian.

Pat Smith, also an investigator with the Harris County District
Attorney=s Office, rode
with Boucher during the surveillance.  He testified that, after Cindy, Krystal, and Espirit left the
Brenham Home Depot, they went to a Wal-Mart and a Lowe=s in Bryan.  They left the Wal-Mart
without any merchandise.  At the Lowe=s, however, he observed Cindy and
Krystal go to the plumbing aisle where they were Ahandling and looking at@ Delta brand faucets.  He saw Krystal
return a box to the shelf as Cindy talked on a cell phone.  They left the
aisle, but then returned and handled the boxes again, as Krystal talked on a
cell phone.  He then saw Espirit, who was talking on her cell phone, go
directly to the same area, where she picked up the same boxes, put them in her
basket, and purchased them.  After the trio left the store, Smith spoke with
the cashier and determined that they had purchased two Delta faucets retailing
for $208 apiece for approximately $27 apiece.  The tape register from the
transaction reflected that Espirit purchased water filters, but Smith testified
that was not was he saw her purchase, and a still photograph taken from video
of the purchase also showed that she was buying a Delta faucet.








Smith also testified that, as a part of the investigation,
he used his own eBay account to purchase a Delta faucet from Bwatchers.  Emails
confirmed that the purchase was shipped from Abaywatch@ at Cindy=s Spanish Needle
address, and that Smith paid Anickjahanian@hotmail.com@ $157.50 for the Anew in box@ faucet.  The
return address on the packaging in which he received the faucet also reflected
Cindy=s Spanish Needle
address.  On cross-examination, Smith admitted there was no way to determine
where the faucet he bought from Bwatchers came from.  He also testified that
there was no way for retailers to trace an item purchased on eBay back to a
particular store.

Valerie Baker, Nicholas Jahanian=s former
girlfriend, testified that Nicholas eventually revealed to her the theft ring=s operation after
the relationship grew more serious.  Among other things, Baker testified that
they often chose Wal-Mart and Target stores because they had young cashiers who
did not know the price of electronics.  The types of items she saw Cindy and
Krystal deliver to Nicholas included shavers, paintball guns, faucets, phones,
cameras, and other electronics.  Baker testified that she helped Nicholas steal
by assisting him in packaging the stolen items to be sent to purchasers.  On
cross-examination, Baker admitted that she never saw Nicholas, Cindy, or
Krystal steal anything, and all her information concerning the theft ring=s operation came
from Nicholas only.  She also admitted that she and Nicholas sold some
legitimate items on eBay and that they had joined a wholesalers club.  She
further admitted that she could not deny that Cindy or Krystal may have
obtained items from places like flea markets or pawn shops to sell on eBay.








Dee Williams, a loss-prevention manager at Target, also
participated in the surveillance of Cindy, Krystal, and Espirit on January 26,
2006.  She testified about details of the ring=s operation from
her observations and the videos.  She also testified that, while visiting a
Pasadena Target, she learned that two days earlier, on January 24, Cindy,
Krystal, and Espirit attempted to carry out their operation at that store. 
Store video showed Cindy and Krystal entering the store, and Espirit entering shortly
thereafter.  Cindy and Krystal removed Kodak bundle packs from a shelf and went
to the back of the store.  Several minutes later, they returned the merchandise
to the shelf.  Espirit then picked up two Kodak bundle packs from the shelf and
attempted to check out with them.  The items, which were priced at $249.99
apiece, rang up as Lexmark printer cartridges for $27.99 apiece.  The cashier
saw that the items were not ringing up at the correct price and informed the
loss-prevention team.  She also peeled off the UPC codes and re-scanned the
items at their correct price.  Espirit did not purchase the items.

Williams further testified that the Jahanians= operation enabled
them to actually pay as little as $6 for each stolen item, and that they could
even make money on the purchases aside from just the sales on eBay.  She
explained that they would purchase a Lexmark printer cartridge costing $27 for
$6 by switching the correct UPC code with the UPC code for a $6 water filter. 
Once the printer cartridge was obtained, the Jahanians would have a UPC code
for that item to use to purchase the more expensive items like cameras,
high-dollar phones, and shavers for $27 each.  When they purchased a more
expensive item for $27, they received a receipt showing the purchase of a
Lexmark printer cartridge for $27.  They would then use that receipt to return
the printer cartridge (for which they actually paid $6) and obtain a refund of
$27 (for a net profit of $21).  Thus, Williams testified, the ring could
actually make money on the Lexmark printer cartridge purchase.  And, by
employing this scheme, it cost the Jahanians $6 to steal a high-dollar item
like a shaver, phone, or camera.








Williams also testified that the ring had made such a
transaction at the Pasadena Target.  She explained that video from that Target
showed that a little less than an hour before Espirit attempted to purchase the
Kodak printer bundles, Cindy was shown returning two Lexmark printer cartridges
in exchange for cash totaling $57.50.  From the original receipt, Williams was
able to determine that the purchase was made on January 19, 2006, five days
earlier, at a Target in San Antonio.  Photographs from that store showed
Espirit buying two shavers, priced at between $150 and $250, that rang up as
Lexmark printer cartridges.  That purchase generated the receipt Cindy used to
return Lexmark printer cartridges in exchange for cash.  Thus, Williams
testified, the ring was able to purchase about $400 worth of merchandise for
about $50, and then obtain a refund of about $50 from a $6 purchase.  Williams
further testified that she was able to identify numerous similar transactions
at Target stores in other locations, such as Galveston, Clear Lake Shores,
Kemah, Baybrook, Pearland, Tomball, and San Antonio.  

On cross-examination, Williams testified that the overall
loss figure for the transactions she observed and was able to document was approximately
$2,500.  On redirect, however, she explained that this amount was based on her
investigation of a roughly thirty-day period in a limited geographical area.

The State=s next witness was Elizabeth Espirit.  She
testified that she had served jail time for engaging in the theft ring
involving Cindy, Krystal, and Nicholas.  She explained that she became involved
through her husband, who was in the Harris County jail with B.J. Jahanian. 
B.J. had given her husband Krystal=s phone number so
that Espirit could call her about some work.  She testified that Cindy and
Krystal would give her instructions, and they would go to Target, Lowe=s, Wal-Mart, Home
Depot, and Academy stores to carry out the scheme.  She also testified to the
details of the theft ring=s operation, and confirmed that the ring
stole all of the kinds of items listed on the indictment.  She testified that
they typically went out once or twice a week to steal, and each time they would
go to between four and seven stores.  Usually they would get one or two
expensive items, unless they were getting ink cartridges, in which case they would
get several.  Concerning refunds, Espirit testified that they would use
receipts to get cash, but if they did not have a receipt, they would take a
previously stolen item to one of the stores and get a gift card.  She estimated
that she personally stole about $160,000 worth of merchandise.  








On cross-examination, Espirit admitted that she really did
not know how much she had stolen.  She also admitted that she had met Nicholas
Jahanian only once, and testified that he never gave her any instructions and
she never saw him handle any stolen merchandise.  She also testified that,
after she spent time in jail, she pleaded guilty and was sentenced to ten years=
deferred-adjudication probation and ordered to pay $50,000 in restitution.

Richard Schroeder, another participant in the theft ring,
testified that he stole with the Jahanians from 2004 until 2006, and that he
had previously been arrested for stealing with them.  Most of the time, he
would go with Cindy and Krystal, or Krystal and her ex-husband, to stores in
and around various Texas cities, including Austin, San Antonio, Dallas, Fort
Worth, Arlington, and Houston.  As an example, Schroeder testified that they
would go to Dallas about once a month and spend three or four days there.  Each
day they would go to eight to ten stores.  In Houston, they would go out three
or four days a week, and he went with them for over a year.  Schroeder also
testified that he and Nicolas once went to a Wal-Mart where Nicholas changed
the bar code on a flat-screen television and Schroeder was arrested when he
attempted to check out with the item.  Nicholas was not arrested because he had
already left the store.  On cross-examination, Schroeder admitted that Nicholas
never gave him any instructions or bar codes, and never gave him any money.








Jeremy Roble, a fraud investigator at eBay, explained how
the eBay online-auction process works, and confirmed that the market is
worldwide for items sold on eBay.  He also explained that to put something for
sale on eBay, one must create an eBay username or account, and have an e-mail
address.  He testified that he responded to a subpoena for records in this
case, and in searching for information, he found that Nicholas Jahanian first
established an account with eBay in August 2003, under the username Nick
Jahanian, and he provided the e-mail address of ANickJahanian@hotmail.com.@  In October 2004,
the username changed from Nick Jahanian to Bwatchers and the e-mail address
changed to AeBaywatchers@hotmail.com.@  Roble further
testified that State=s Exhibit 2A listed all of the
transactions involving the Bwatchers account, and that the total sales price
for the listed items was $258,970.36.  He further testified that the list would
not include sales after the end of October 2005, when he responded to the
subpoena, and so it would not include sales from November 2005 through February
2006.

Todd Quattlebaum, the president of EZ Bayer, Incorporated,
testified that his company buys and sells inventory for businesses and
individuals on eBay.  He testified that in 2003, Nicholas Jahanian listed some
Panasonic DVD recorders and other items for sale through the company. 
Quattlebaum testified that Nicholas told him he was getting the items from a
wholesaler.  Quattlebaum also testified that the items Nicholas brought were
all factory-sealed.  After subtracting the company=s fees for its
services, Quattlebaum=s records reflected 141 transactions for
Nicholas totaling $13,611.23.  Quattlebaum also estimated that his records did
not reflect an additional twenty or thirty transactions.

Marshall Poe, a loss-prevention manager for Home Depot,
testified as a representative of Home Depot and was one of the persons alleged
in the indictment to be the owner of the stolen property.  He testified that he
participated in the surveillance on January 26, 2006, of Cindy and Krystal at
the Home Depot.  He identified numerous items from State=s Exhibit 2A as
the type of items sold by Home Depot.  He also testified that he had a greater
right to possess items stolen from Home Depot than the thief who had stolen
them.  On cross-examination, Poe acknowledged that Home Depot did not sell some
of the types of items on the list.  He also could not attribute the loss of
specific items to the Jahanians, and he did not know whether items on the list
came from the Home Depot.  Poe further testified that Home Depot did not have
the technology to determine whether someone had been switching bar codes, and
there was no way for them to check to see if they had video of the Jahanians
conducting their activities in their stores.  Poe also confirmed that Home
Depot did not have the ability to track a serial number from a package to a
particular store.  He further testified that Home Depot employees purchased two
items over the internet from Bwatchers, and the items were shipped from Cindy=s Spanish Needle
address.








Tim Scott, who worked in loss prevention at Lowe=s, also testified
as that store=s representative and was alleged in the indictment to
be an owner of the stolen property.  He identified items on State=s Exhibit 2A as
the types of items Lowe=s sells, and testified that he had a
greater right to possess merchandise stolen from Lowe=s than the thief
who had stolen it.  On cross-examination, he acknowledged that there were items
on the list that Lowe=s did not sell, and other than the items
he saw the Jahanians steal during his participation in the January 2006
surveillance, he could not tell whether the items on State=s Exhibit 2A were
Lowe=s property.  Scott
also acknowledged that Lowe=s did not have the technology to match a
bill of lading for items at Lowe=s to the items
sold on eBay.

Thomas Brady Bailey similarly testified as Target=s representative
and was another person alleged in the indictment to be an owner of the stolen
property.  Bailey, an investigator specializing in organized-crime
investigations with Target, and who was then assigned to the United States
Secret Service Federal Task Force, was also involved in the surveillance of the
Jahanians on  January 26, 2006.  He testified that he had a greater right to
possess the stolen items than the thief.  He also testified that Target did not
have the technology to trace a specific item back to a particular Target
store.  Bailey identified the types of items listed on State=s Exhibit 2A that
were sold at Target.  

At the prosecutor=s request, Bailey
had previously picked out some of the items from the list to compare what
Nicholas Jahanian sold them for on eBay to the sales price at Target.  He
testified that the average difference was thirty percent.  Accordingly, Bailey
testified that, applying that percentage to all of the stores, the $258,970.36
figure shown on State=s Exhibit 2A would have to be increased by
approximately thirty percent to determine the approximate retail value of the
property.  On cross-examination, Brady identified items on State=s Exhibit 2B that
Target did not sell.  He also confirmed that the percentage of loss numbers he
was asked to calculate by the district attorney=s office were
estimates.








The last of the store representatives who was alleged in
the indictment to be an owner of the stolen property was Mary Jo Meador, who
testified as a representative of Wal-Mart.  She testified that Wal-Mart sold
many of the types of items listed on State=s Exhibit 2B, and
also testified that she had a greater right to possess the items stolen than
the thief.  On cross-examination, she identified items on the list that
Wal-Mart does not sell.  She also admitted that she could not trace any of the
items on the list back to Wal-Mart, and she acknowledged that some of the items
were sold by numerous retailers.  She also admitted that she was not able to
document any loss resulting from the Jahanians= activities. 
Finally, she acknowledged that she could not say that she had a greater right
of control over any item specifically listed on State=s Exhibit 2A.

Larry Boucher, Osterberg=s supervisor at
the district attorney=s office, was recalled to the stand, and
he testified concerning the arrests of Cindy, Krystal, and Nicholas Jahanian
and the execution of the related search warrants.  He described how Cindy and
Krystal were arrested at Cindy=s house on Spanish Needle.  In executing
the search warrant, the officers found, among other things, a printer and fax
machine, an envelope containing UPC codes, and the paper stock on which UPC
codes would be printed.  The codes matched those recovered during the
surveillance of Cindy, Krystal, and Espirit.  In Krystal=s car, parked
outside the house, they found more UPC codes in Krystal=s purse, and in
the passenger-door compartment they found more of the paper stock used to print
UPC codes as well as two pairs of scissors.  In the trunk, they found several
Target bags and receipts from Target, Wal-Mart, and Lowe=s for items
purchased for use in the theft scheme.  








Boucher also described what was found in a storage unit
that was searched with Cindy=s consent.  There, the investigation team
found nearly one hundred shopping bags.  The largest number came from Target,
and many of the bags had loose UPC codes stuck to them.  There were also bags
from Wal-Mart, Lowe=s, Home Depot, and Academy, along with
some crumpled UPC codes.  The officers also found at the storage facility
shipping boxes labeled with Nicholas Jahanian=s name and
address.

The defendants, including Krystal, rested after the State
presented its case and did not present any testimony or other evidence.

Analysis

On appeal, Krystal raises two issues.  In the first issue,
she contends that the state=s evidence proved only that she was guilty
of theft of property of a value constituting no more than a third-degree,
state-jail felony.  In the second issue, she contends that the evidence of the
value of the property stolen was factually insufficient.

A.      Standards
of Review 

In reviewing the legal sufficiency of the evidence, we look
at the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S.
307, 319 (1979); Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App.
2002).  Although we consider all evidence presented at trial, we may not
re-weigh the evidence and substitute our judgment for that of the jury.  King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  The jury is the
exclusive judge of the credibility of witnesses and of the weight to be given
their testimony, and it is the exclusive province of the jury to reconcile
conflicts in the evidence.  Mosley v. State, 983 S.W.2d 249, 254 (Tex.
Crim. App. 1998).








In reviewing the factual sufficiency of the evidence, we
view all of the evidence in a neutral light. See Cain v. State, 958
S.W.2d 404, 408 (Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996).  We may set the verdict aside if (1) the evidence
is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the
verdict is against the great weight and preponderance of the evidence.  Watson
v. State, 204 S.W.3d 404, 414B15 (Tex. Crim.
App. 2006) (citing Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000)).  While we may disagree with the jury=s conclusions, we
must exercise appropriate deference to avoid substituting our judgment for that
of the jury, particularly in matters of credibility.  Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); see also Watson, 204 S.W.3d
at 414 (stating that an appellate court should not reverse a verdict it
disagrees with unless it represents a manifest injustice, though supported by
legally sufficient evidence).  Thus, while we are permitted to substitute our
judgment for that of the jury when considering credibility and weight
determinations, we may do so only to a very limited degree.  Marshall v.
State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

Circumstantial evidence is as probative as direct evidence
in establishing an actor=s guilt.  Guevara v. State, 152
S.W.3d 45, 49 (Tex. Crim. App. 2004).  Indeed, circumstantial evidence alone is
sufficient to establish guilt.  Id.  Furthermore, the standard of review
on appeal is the same for both direct- and circumstantial-evidence cases.  Id.


A person engages in organized criminal activity Aif, with the
intent to establish, maintain, or participate in a combination or in the
profits of a combination, . . . he commits or conspires to commit@ one of several
enumerated offenses, including theft.  Tex. Penal Code Ann. ' 71.02(a)(1)
(Vernon 2003 & Supp. 2008).  Theft is committed when a person Aunlawfully
appropriates property with intent to deprive the owner of property.@  Tex. Penal Code
Ann. ' 31.03(a) (Vernon
2003 & Supp. 2008).  AAppropriate@ means Ato acquire or
otherwise exercise control over property other than real property.@  See Tex.
Penal Code Ann. ' 31.01(4)(B) (Vernon 2003 & Supp.
2008).  Appropriation of property is unlawful if it is Awithout the owner=s effective
consent@ or Athe property is
stolen and the actor appropriates the property knowing it was stolen by
another.@  See Tex.
Penal Code Ann. ' 31.03(b)(1), (2).

 

 

 








B.      Application
of Law to Facts

1.       Legal
Sufficiency and Factual Sufficiency of the Evidence

On appeal, Krystal does not challenge the sufficiency of
the evidence to prove beyond a reasonable doubt that she engaged in organized
criminal activity.  Rather, Krystal contends only that the State=s proof was
deficient concerning the ownership and value of the stolen property. 
Specifically, Krystal asserts that Ait is undisputed@ that the
testimony of the alleged owners of the stolen property shows Athat none of their
stores carried, sold and therefore owned, all of the items alleged in the
indictment@ and therefore the evidence was insufficient to show
that they Ahad care, custody and control of all the items of
property.@  Consequently, she contends, the evidence is
insufficient to support the jury=s finding that the
value of the property stolen was in excess of $200,000. 

In addition to the testimony of the store representatives,
Krystal points to investigator Osterberg=s testimony, in
which he admitted that the store representatives could not confirm to him that
particular items listed on State=s Exhibit 2A
actually came from their stores, and that he assumed all of the listed items
had been stolen.  She also points to the evidence that the value of the items
investigator Boucher and Dee Williams of Target actually observed being stolen
during surveillance was about $600 and $2,500, respectively.  She further
complains that, although Elizabeth Espirit initially testified that she had
stolen about $160,000 in merchandise from various stores, on cross-examination
she admitted she did not really know how much she had stolen; and Richard
Schroeder, although testifying to numerous thefts in several cities, did not
identify what items he actually stole or their value.  Thus, Krystal argues,
the State proved only that she and the theft ring stole over $1,500 but less
than $20,000, supporting Aat most a conviction for a third degree
felony.@  Because Krystal
relies on the same arguments to support her factual-sufficiency analysis, we
will address both legal and factual sufficiency together.








Krystal cites no cases to support her position on
ownership.  Concerning value, however, she relies on three cases applying the
rule that in circumstantial evidence cases in which the State relies solely on
the defendant=s unexplained possession of recently stolen property
to sustain a theft or burglary conviction it must prove the property in the
defendant=s possession was the identical property taken.  See
Bibbs v. State, 658 S.W.2d 618, 619B20 (Tex. Crim.
App. 1983) (holding that evidence was insufficient to sustain theft conviction
when State failed to show that pipe defendant sold was same pipe identified as
stolen pipe); Owens v. State, 576 S.W.2d 859, 860B60 (Tex. Crim.
App. [Panel Op.] 1979) (holding evidence insufficient to support burglary
conviction when State failed to prove rifles handled by defendant were same or
similar to stolen rifles); York v. State, 511 S.W.2d 517, 518B19 (Tex. Crim.
App. 1974) (applying rule and holding that evidence was insufficient to sustain
theft conviction when State failed to prove blinker light in defendant=s possession was
same property stolen from complainant). 








But here Krystal was convicted of engaging in organized
criminal activity, and the State did not solely rely upon possession of
recently stolen property to prove the ownership or identity of the stolen
property.  Thus, the cases Krystal relies upon are distinguishable.  The jury
heard the cross-examinations of the witnesses, including the store
representatives= admissions that they could not
specifically connect any of the items on State=s Exhibit 2A to
their stores and the testimony that the value of the items the witnesses
actually saw being stolen was relatively small.  But, the State=s inability to
demonstrate a connection by serial number or other identifier does not by
itself render the evidence legally or factually insufficient.[7] 
See Guevara, 152 S.W.3d at 49 (A[T]he lack of
direct evidence is not dispositive of the issue of a defendant=s guilt.@).  To support its
allegations, the State presented not only circumstantial evidence, but also
accomplice testimony and other evidence to establish that most, if not all, of
the property shown on State=s Exhibit 2A was stolen from the stores
whose representatives are named in the indictment.  The testimony from the store
representatives established that each of the stores sold in varying degrees
merchandise of the types alleged in the indictment that State=s Exhibit 2A
reflected was sold by Nicholas Jahanian on his eBay account.  The accomplice
testimony and other evidence, discussed above, showed that (1) the theft ring
of which Krystal was a part stole large quantities of the types of merchandise
alleged in the indictment from the stores during the relevant time, and (2)
Nicholas sold the merchandise stolen by the ring from those stores on eBay for
the benefit of the theft ring=s members.  








Additionally, State=s Exhibit 2A
showed not only the vast quantity of merchandise of the types alleged in the
indictmentCover 2,000 itemsCbut also the price
at which he actually sold each of the items.  The State concedes that the aggregate
total sales price amount of $258,9770.36 shown on State=s Exhibit 2A
included some items that were either not alleged in the indictment, mentioned
in the charge, or within the types of merchandise shown sold by the stores, and
therefore were not to be included in calculating the value of the merchandise
stolen from the stores.[8] 
But the jury was aware from the cross-examinations of the witnesses that some
of the items should not be considered in its value determination.  The jury was
capable of reviewing State=s Exhibit 2A and determining which items
should be disregarded and which were included in the indictment.  From that,
the jury could determine the aggregate value of the items it found were stolen
from the stores whose representatives were named in the indictment and conclude
that the value of the stolen items exceeded $200,000.  See Valdez v. State,
116 S.W.3d 94, 98B99 (Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d) (rejecting claim that evidence of value
over $200,000.00 was legally and factually insufficient in theft prosecution in
which investigator calculated the value of stolen electronic components by
determining the lowest price for which the items could have been purchased near
the time of the theft and appellant offered contradictory testimony that the
value was much lower based on the amount for which he could sell certain of the
stolen items).

Moreover, it is well established that a fact finder can
determine the identity and ownership of stolen property from circumstantial
evidence.  See Jordan v. State, 707 S.W.2d 641, 644B45 (Tex. Crim.
App. 1986) (AProof of ownership may be made by circumstantial
evidence, just as any other issue in a criminal case.@); Jones v.
State, 458 S.W.2d 89, 91B92 (Tex. Crim. App. 1970) (A[A]rticles in an
accused=s possession may
be identified by circumstantial evidence as well as by direct testimony.  If it
appears it or they correspond with articles that were stolen, the question may
go to the jury.@); Villani v. State, 116 S.W.3d
297, 306 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d) (AProof of ownership
may be made by circumstantial evidence.@); Robinson v.
State, No. 01-85-00970-CR, 1986 WL 12889, at *2 (Tex. App.CHouston [1st
Dist.] Nov. 13, 1986, pet. ref=d) (not designated for publication) (AIt is well settled
that the identity and ownership of stolen property may be established by
circumstantial evidence.@).








We conclude that this case is more analogous to the
authorities the State cites, in which the facts and circumstances surrounding
the defendant=s possession of stolen property were evaluated to
determine whether the evidence was sufficient to identify the property as that
stolen from the complainant.  See Benson v. State, 240 S.W.3d 478, 481B82 (Tex. App.CEastland 2007,
pet. ref=d) (AWe hold that the
evidence is sufficient to support Benson=s conviction. . .
. In this case, Benson was shown having several items similar to those taken
without there being any variance between the description and the items she had
in her possession. . . . As noted by Benson, a conviction may no longer fall
because the property possessed is not shown to be the identical property taken.@); Rogers v.
State, 929 S.W.2d 103, 108 (Tex. App.CBeaumont 1996, no
pet.) (rejecting claim that evidence was insufficient to support burglary
conviction and noting that it was for the fact finder to weigh whatever
descriptive evidence and circumstances of guilt are presented regarding
identification of the missing property to determine whether the property
possessed by the defendant is the same property taken from the complainant=s residence,
including the particular setting in which the accused possessed the property
and the specific type and quantity of the property possessed); see also
Nickerson v. State, 810 S.W.2d 398, 399B401 (Tex. Crim.
App. 1991) (holding that evidence was legally sufficient to establish that
equipment recovered from car in which defendant was passenger was same
equipment taken from electronics store even though the evidence did not show
that it was the identical property taken).








Under these facts, therefore, the jury could have
rationally inferred that all of the types of merchandise shown on State=s Exhibit 2A and
that were alleged in the indictment and named in the court=s charge had been
stolen from those stores by the theft ring=s members and that
the value of the stolen merchandise exceeded $200,000.  And, viewed in a
neutral light, the evidence is not so weak that the jury=s verdict seems
clearly wrong and manifestly unjust, nor is the contrary evidence so strong
that the jury=s verdict is against the great weight and
preponderance of the evidence.  See Watson, 204 S.W.3d at 415B16; Jahanian v. State, No.
14-07-00703-CV (Tex. App.CHouston [14th Dist.] May 28, 2009, no pet. h.) (mem. op., not
designated for publication) (holding evidence of identity and value of property
legally and factually sufficient to support conviction of co-defendant
Cindy Jahanian); Jahanian v. State, No. 14-07-00700-CR (Tex. App.CHouston [14th Dist.] May 28, 2009, no
pet. h.) (mem. op., not designated for publication) (holding evidence
that allegedly stolen items were taken from the complaining witnesses= stores was
legally and factually sufficient to support conviction of co-defendant Nicholas
Jahanian).

Conclusion

We overrule Krystal Jahanian=s issue and affirm
the trial court=s judgment.

 

 

 

 

/s/      Jeffrey V. Brown

Justice

 

 

Panel consists of
Chief Justice Hedges and Justices Guzman and Brown.

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  Cindy Jahanian, Krystal Jahanian, and Nicholas
Jahanian were tried together, while Bahram Jahanian, who represented himself,
was tried separately.  All of the defendants have filed appeals in this court.





[2]  There was also evidence indicating that UPC codes
were forged for this purpose.





[3]  The indictment against Krystal, as amended, alleged
the following types of merchandise:  shavers, MP3 players, faucets, music
stations, speakers, printers, camcorders, thermostats, cameras, printer docks,
print servers, software, phones, DVD-VHS recorders, DVD recorders, paintball
markers with masks and tanks, toothbrushes, paintball guns, tennis racquets,
gift cards, water filters, and print cartridges.  The owners of the property
were alleged to be Brady Bailey, Tim Scott, Marshall Poe, and Mary Jo Meador,
as representatives of Target, Lowe=s,
Home Depot, and Wal-Mart, respectively.





[4]  The address for the Bwatchers account was Cindy
Jahanian=s home on Spanish Needle.





[5]  Osterberg also testified that the persons who
purchased the items from Bwatchers were not contacted by law-enforcement
personnel.





[6]  The trio were also captured on video at the second Target store, and
the State published to the jury two DVDs depicting Cindy, Krystal Jahanian, and
Elizabeth Espirit at this store as part of its examination of Osterberg
concerning the theft ring=s method of operation.





[7]  The evidence showed that Nicholas Jahanian promptly
sold the property taken by the theft ring through his eBay account and shipped
it to the purchasers throughout the country and elsewhere.  Testimony from the
store representatives established that property taken from the stores was not
susceptible of identification by serial number or other unique identifier. 
Thus, as a practical matter, in an organized-criminal-activity case of this
type the State could rarely ever prove that all the property a theft ring stole
and sold in a worldwide market such as eBay was the exact property taken from
the victims because of the manner in which the theft ring disposed of it.





[8]  Although Krystal does not complain about the
presence of such items listed on State=s
Exhibit 2A in her argument, the items included, for example, two Bally=s Premier Lifetime Gym Memberships sold for a total of
$1,317.00, several pairs of U2 tickets, sold for a total of $1,045.35, an
Oldsmobile Cutlass sold for $338.00, three other cars sold for a total of
$10,349.99, and a used black leather sofa sold for $51.00.  Also on the list
were several gift cards from stores not represented in the indictment, such as
Office Depot, Linens-N-Things, Best Buy, and Academy.  These items reflected a
small portion of the extensive list of items on State=s Exhibit 2A.